EXHIBIT

1



**U.S. Securities and Exchange Commission**

MARSHALL GANDY
Attorney for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
Texas Bar No. 07616500
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas 76102-6882
Telephone: (817) 978-6464
Fax: (817) 978-4927

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PHOENIX DIVISION

**SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

vs.

**IRA J. GAINES,**
Individually and doing business as
**WRIGLEY DRIVE PARTNERS and MORTEN AVENUE PARTNERS,**

Defendant.

: **CASE NO.**
:
:
: **COMPLAINT FOR VIOLATION OF THE**
: **FEDERAL SECURITIES LAWS**
:

The United States Securities and Exchange Commission ("Commission") files this complaint against Defendant, Ira J. Gaines, individually and doing business as Wrigley Drive Partners ("Wrigley") and Morten Avenue Partners ("Morten"), and would respectfully show the Court as follows:

### PRELIMINARY STATEMENT

1. From September 1999 through March 2001, Ira J. Gaines ("Gaines") made fraudulent mini-tender offers to purchase from shareholders up to 1% of the outstanding stock of 287 public companies.

2. The term "mini-tender offer" is securities industry shorthand for a tender offer resulting in ownership by the offeror of not more than 5% of a class of securities. Mini-tender offers are not subject to the filing or procedural requirements of Section 14(d) of the Securities Exchange Act of 1934

("Exchange Act") and Regulation 14D thereunder, but they are subject to the antifraud provisions in Sections 14(e) and 10(b) of the Exchange Act, and Rules 14e-1 and 10b-5 thereunder.

3. In his mini-tender offers, Gaines misled shareholders by failing to disclose material information and failing to ensure that material information was received by shareholders. The material information not received by shareholders included: (1) that Gaines' offer price was below the prevailing market price; (2) that Gaines reserved sole discretion to modify his offers, including the offer price and offer period; and (3) that Gaines could terminate his offers without notice, regardless of how many shareholders had tendered shares.

4. Gaines also misled shareholders by falsely implying that he had sufficient cash on hand to buy up to 1% of the outstanding shares of the targeted company.

5. Gaines knew, or was reckless in not knowing, that the shareholders were not receiving complete and accurate material information about the mini-tender offers.

6. The material information that did not reach the shareholders would have alerted them to the material terms of Gaines' unfair offers.

7. By consistently offering below-market prices, and by reserving unfettered discretion to change at any time the terms of his offers, including the offer price and the offer period, Gaines virtually guaranteed his own profits without undertaking any risk.

8. Through the use of mini-tender offers, Gaines succeeded in purchasing shares of a number of public companies at below-market prices.

9. As a result of his mini-tender offers, Gaines received profits of approximately $275,000.

10. Gaines previously came under Commission scrutiny in connection with mini-tender offers he conducted between June 1998 and mid-1999, when he controlled IG Holdings, Inc. ("IG Holdings"), an Arizona corporation.

11. On behalf of IG Holdings, Gaines consented to a Commission cease-and-desist order for violations of the tender offer antifraud provisions in Section 14(e) of the Exchange Act. *In the Matter of IG Holdings, Inc.*, Exchange Act Rel. No. 41759 (August 19, 1999).

12. Less than 30 days after issuance of the order in *IG Holdings*, Gaines resumed his fraudulent tender offer scheme under the new business name, Wrigley.

13. Gaines stopped using the company name of IG Holdings and began doing business as Wrigley to avoid the taint associated with the Commission's cease-and-desist order against IG Holdings.

14. In July 2000, when he became aware of the Commission's investigation into his Wrigley-related activities, Gaines discontinued using the business

name of Wrigley, but continued his fraudulent tender offer scheme using the business name Morten.

15. While the investigation of Wrigley was ongoing, Gaines continued perpetrating the fraud via Morten, and attempted to shield those activities from the Commission's investigation by (a) delaying his production of documents sought by the Commission's staff; (b) failing to produce all the documents that the staff requested; and (c) delaying his testimony.

16. By reason of these activities, the Defendant has violated Sections 10(b) and 14(e) of the Exchange Act, and Rules 10b-5 and 14e-1 thereunder. The Commission, in the interest of protecting the public from any further fraudulent activity, brings this action against Gaines, seeking permanent injunctive relief, disgorgement of illicit profits, plus accrued prejudgment interest, and a civil money penalty.

## JURISDICTION

17. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], to enjoin Gaines from future violations of the federal securities laws, and to seek disgorgement, prejudgment interest, and a civil penalty.

18. The Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19. Gaines, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

20. Certain of the transactions, acts, practices and courses of business alleged herein took place in the District of Arizona.

## DEFENDANT

21. Ira J. Gaines, age 53, is a resident of Phoenix, Arizona. Since 1999, Gaines has, at various times, done business under the names Wrigley and Morten.

## STATEMENT OF FACTS

### A. Gaines' Mini-Tender Offer Procedures

22. From September 1999 through March 2001, Gaines made mini-tender offers to purchase the stock of 287 public companies, including AT&T Corporation, W.R. Grace & Co., and Sara Lee Corporation.

23. For each of his tender offers, Gaines prepared (a) a page setting forth the terms of the offer, and (b) a two-page assignment form with various warranties and instructions for tendering shares.

24. Gaines forwarded those documents to Northern Trust Company in Chicago ("Northern Trust"), a bank that serves as securities custodian for its bank customers.

25. Each of Gaines' offers involved an active and widespread solicitation of shareholders, because Gaines caused his offers to be communicated to all shareholders of the target company who were custodial customers of Northern Trust.

26. After determining which of its customers, if any, owned shares of the company targeted by Gaines, Northern Trust e-mailed, to contact persons or contact entities designated by those customers, a summary notice of Gaines' offer (the "Notice").

27. The Notice contained the name of the target company; offer price (to be paid "in cash"); the date and time when the offer would expire; the identity of the offeror and its contact information; that the offer sought up to 1% of the shares of the target company; that no "protect period or withdrawal privilege" was available; the name of the depositary; and that tenders of shares would be "accepted on a first come, first served basis."

28. The Notice did not recite any other terms of the offer, or include any other representations.

29. Upon election by a customer to participate in Gaines' tender offer, Northern Trust delivered the shares to the appropriate transfer agent for registration in Gaines' name, and notified Gaines of the name and address of the tendering shareholder, the number of shares tendered, and the total amount Gaines owed the shareholder for purchase of the shares.

30. Gaines then purchased the tendered shares by mailing a check to the tendering shareholder at the designated address.

### B. Gaines' Purchases of Securities Pursuant to His Mini-Tender Offers

31. In response to 70 of Gaines' tender offers, a total of 175 shareholders tendered, and Gaines purchased, 137,842 shares, for an aggregate offer price of approximately $1.5 million.

32. Although Gaines terminated 10 of the offers that resulted in tenders of shares, he paid for shares that were tendered in response to at least 60 offers.

33. Gaines purchased tens of thousands of shares of public companies from 175 different shareholders.

34. Each of Gaines' offers, if fully subscribed and not terminated by Gaines, would have resulted in Gaines' acquisition of millions of shares of the target company's securities.

### C. Gaines' Use of Means and Instrumentalities of Interstate Commerce and the Mails

35. For each mini-tender offer, Gaines forwarded by use of the mails, and by means and instrumentalities of interstate commerce such as electronic mail, facsimile transmissions, and commercial couriers: (a) a page setting forth the terms of the offer, and (b) a two-page assignment form with warranties and instructions for tendering shares, to Northern Trust.

36. Gaines purchased tendered shares by mailing checks to the tendering shareholders.

37. Gaines also used the mails, telephone, electronic mail, facsimile transmissions, and commercial couriers to make other communications as part of his mini-tender offer scheme.

### D. Misrepresentations and Omissions

### (i) The Terms of the Offers

38. The documents that Gaines forwarded to Northern Trust for each of the 287 mini-tender offers included the following terms, which were common to all 287 offers:

> (a) that "the [offer] price is lower than the market";
>
> (b) that the offer could be extended "at the sole discretion of the purchaser [Gaines]"; and
>
> (c) that Gaines "reserves[s] the right to terminate or amend [the] offer without notice."

39. This material information regarding the terms of Gaines' offers failed to reach the shareholders because the Notice that Northern Trust forwarded to the designated contacts contained none of those terms.

40. As a result, shareholders did not learn, before tendering their stock to Gaines:

> (a) that the offer price of the stock was below the market price of the stock;
>
> (b) that Gaines reserved sole discretion to amend the offer price and the offer period; or
>
> (c) that Gaines reserved sole discretion to terminate his mini-tender offers without notice.

### (ii) Gaines' Ability to Purchase the Shares He Solicited

41. Each Notice that Northern Trust forwarded to targeted shareholders recited an amount to be paid "in cash" for tendered shares, implying that Gaines had sufficient cash on hand to buy up to 1% of the outstanding shares of the targeted company.

42. In many instances, however, Gaines actually did not have sufficient cash on hand to buy up to 1% of the outstanding shares of the targeted company.

43. For example, when Gaines offered to purchase up to 1% (about 3.8 million shares) of the outstanding stock of AT&T Corporation for $30.75 per share, Gaines did not have the $116,850,000 that those shares would have cost, had they been tendered in response to Gaines' offer.

### E. Gaines' Knowledge of the Misrepresentations and Omissions

44. Gaines chose Northern Trust as the conduit for his mini-tender offers, chiefly because Northern Trust did not charge a fee for processing the offers.

45. Gaines began using Northern Trust after an entity he used previously, the Depository Trust Company ("DTC"), began charging Gaines a $2,700 fee for each offer.

46. Gaines learned, through his dealings with DTC, through his association with IG Holdings, and through the Commission's cease-and-desist order against IG Holdings, that custodians such as Northern Trust do not forward entire documents delivered to them by tender offerors, but rather, forward a summary notice setting forth only limited information, such as the offer price, the offer period, and the identity of the offeror.

47. Although he could have done so, Gaines never inquired whether Northern Trust was forwarding to the shareholders' designated contacts the entire document that he provided to Northern Trust.

48. Although he could have done so, Gaines never instructed Northern Trust to forward to the shareholders' designated contacts the entire document that he provided to Northern Trust.

49. Although he could have done so, Gaines did not attempt to ascertain whether shareholders received the information set forth in the document that he provided to Northern Trust.

50. Although he could have done so, Gaines did not attempt to provide shareholders with any information in addition to the Notice that Northern Trust provided.

51. Gaines therefore knew, or was reckless in not knowing, that the shareholders were not receiving complete and accurate material information about the mini-tender offers.

### F. Materiality of the Facts that Gaines Misrepresented and Omitted

52. The fact that Gaines lacked sufficient cash to pay for tendered shares would have been important to a reasonable shareholder, because it increased the likelihood that Gaines would be unable to pay for the shares, and would therefore rescind his offer and return the shares - without compensating the tendering shareholder, who had, while Gaines held the shares, temporarily lost control of his or her shares, as well as his or her ability to respond to changes in the shares' market price.

53. The fact that Gaines was offering to pay less than the prevailing market price for tendered shares would have been important to a reasonable shareholder, because it meant that shareholders tendering shares to Gaines forfeited the difference between the market price and Gaines' offer price.

54. Gaines' discretion to extend the period of a mini-tender offer would have been important to a reasonable shareholder, because it allowed Gaines to deprive the shareholder of control of his or her shares, once tendered, and his

or her ability to respond to changes in the shares' market price.

55. Gaines' discretion to change the offer price would have been important to a reasonable shareholder, because it permitted Gaines to shift the risk of market price fluctuation to the shareholder.

56. Gaines' power to terminate the offers at his discretion (which Gaines actually did on ten separate occasions) would have been important to a reasonable shareholder, because it shifted the risk of market price fluctuation from Gaines to the shareholders; and because it increased the likelihood that Gaines would return the shares - without compensating the tendering shareholder, who had, while Gaines held the shares, temporarily lost control of his or her shares, as well as his or her ability to respond to changes in the shares' market price.

### G. Gaines' Failure to Pay Promptly for Tendered Shares

57. Gaines materially misled the shareholders by giving them no warning of possible delay in payments for tendered shares.

58. The time that elapsed between shareholders' tenders of their shares and Gaines' payment for the shares varied widely. On average, 14 days elapsed between the tender of shares and Gaines' payment. In one instance, Gaines took over seven months to pay for tendered securities.

### H. Gaines' Illicit Profits

59. Gaines obtained net profits of approximately $275,000 by way of the foregoing conduct.

### CLAIMS

### First Claim

### Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5: Fraud in Connection with Purchases and Sales of Securities

60. Plaintiff Commission repeats and incorporates paragraphs 1 through 59 of this Complaint by reference as if set forth *verbatim*.

61. Gaines, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails (a) has employed devices, schemes and artifices to defraud, (b) has made untrue statements of material facts and has omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and (c) has engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

62. As a part of and in furtherance of his scheme to defraud, Gaines, directly and indirectly, in connection with tender offers and purchases and sales of securities, misrepresented material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, including, but not limited to, those set forth in paragraphs 1 through 59 above.

63. Gaines knowingly or recklessly engaged in the conduct described in this Claim.

64. By reason of the foregoing, Gaines violated and, unless enjoined, will continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## Second Claim

### Section 14(e) of the Exchange Act: Fraud In Connection with Tender Offers

65. Plaintiff Commission repeats and incorporates paragraphs 1 through 59 of this Complaint by reference as if set forth *verbatim*.

66. By engaging in the conduct alleged herein, Gaines in connection with a tender offer, a request for invitation for tenders, or a solicitation of security holders in favor of such offer, request or invitation: (a) made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (b) engaged in fraudulent, deceptive or manipulative acts or practices.

67. Gaines knew or recklessly disregarded the fact that his statements and/or conduct with respect to the tender offers described herein included the material false statements and omissions described herein.

68. By reason of the foregoing, Gaines violated, and unless enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-1 [17 C.F.R. § 240.14e-1] thereunder.

## Third Claim

### Exchange Act Rule 14e-1: Failure to Pay Promptly for Tendered Shares

69. Plaintiff Commission repeats and incorporates paragraphs 1 through 59 of this Complaint by reference as if set forth *verbatim*.

70. By engaging in the conduct alleged herein, Gaines failed to pay the consideration he offered promptly after termination of the tender offer.

71. By reason of the foregoing, Gaines violated, and unless enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-1(c) [17 C.F.R. § 240.14e-1(c)] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

(i) permanently enjoining Gaines, and his agents, servants, employees,

attorneys, and those in active concert or participation with him, who receive actual notice by personal service or otherwise, from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-1 [17 C.F.R. §§ 240.10b-5 and 240.14e-1] thereunder.

(ii) ordering Gaines to provide an accounting of all ill-gotten gains from the conduct alleged herein;

(iii) ordering Gaines to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

(iv) ordering Gaines to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(v) granting such other relief as this Court may deem just and appropriate.

Dated: August 28, 2002

Respectfully submitted,

_____

MARSHALL GANDY
Texas Bar No. 07616500
Attorney for Plaintiff
UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
Fort Worth District Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Telephone: (817) 978-6464
Facsimile: (817) 978-4927

Of Counsel:

SPENCER C. BARASCH
District of Columbia Bar No. 388886
JEFFREY A. COHEN
Florida Bar No.606601
ALAN M. BUIE
Texas Bar No. 783751
STEVEN J. GRAHAM
Texas Bar No. 00792542
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
Fort Worth District Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
http://www.sec.gov/litigation/complaints/comp17703.htm

Modified: 08/30/2002

EXHIBIT

2



**J.S. Securities and Exchange Commission**

**UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION**

Securities Exchange Act of 1934
Release No. 41759 / August 19, 1999

Administrative Proceeding
File No. 3-9980

| In the Matter of<br><br>IG HOLDINGS, INC.,<br>Respondent. | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |
|---|---|

I.

The Commission deems it appropriate that proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against IG Holdings, Inc. ("IG Holdings").

II.

In anticipation of the institution of these administrative proceedings, IG Holdings has submitted an Offer of Settle-ment that the Commission has determined to accept. Solely for the purposes of these proceedings and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, and prior to a hearing and without admitting or denying the findings set forth herein, IG Holdings consents to the entry of this Order Instituting Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"). The Commission has determined that it is appropriate to accept the Offer of Settlement from IG Holdings, and accordingly is issuing this Order.

III.

FACTS

Based on the foregoing, the Commission finds that:

A. Respondent

IG Holdings, Inc. is an Arizona corporation, with its principal offices located in Phoenix, Arizona. At all relevant times, IG Holdings has been engaged in the business of investing in securities, including equities, bonds and limited

partnership interests, primarily by making tender offers for such securities.

B. Summary

This proceeding involves certain so-called mini-tender offers made by IG Holdings during 1998 and 1999. Mini-tender offers are tender offers for less than 5% of a class of securities. These offers are not subject to the filing, disclosure and procedural requirements of Section 14(d) of the Exchange Act and Regulation 14D. However, all tender offers, including mini-tender offers, are subject to the antifraud provisions of the federal securities laws, including Section 14(e) of the Exchange Act and Regulation 14E.

IG Holdings violated Section 14(e) of the Exchange Act because it did not sufficiently monitor the means used to disseminate its below market mini-tender offers, which failure, in certain instances, resulted in shareholders not receiving material information about the offers.

C. IG Holdings' Mini-Tender Offers

Beginning in approximately June 1998, IG Holdings began making mini-tender offers to purchase stock. To date, IG Holdings has made more than 200 mini-tender offers, all of which have had offering prices that were less than the prevailing market prices. While there is no requirement that tender offers be made at a premium to the market price, registered third-party "tender offers" are historically equated with an offering price that includes a premium.

IG Holdings initiated its mini-tender offers by contacting an information services firm and telling the firm the names of the target companies, the size of the offers,[1] the offering prices, and the dates for beginning and ending the offers. For each offer, the information services firm prepared a one or two page offering document containing the information from IG Holdings, as well as instructions for tendering shares, and forwarded it to The Depository Trust Company ("DTC").[2]

After DTC received the offering documents from the information services firm, DTC reviewed the documents to ascertain the basic terms of the offers, such as the target security, the identities of the offeror and its agent, the offering price, and any limitations on the quantity of the securities to be purchased. If it determined that an offer could be processed through its facilities, DTC announced the offer to its participants through an electronic announcement system. DTC and the information services firm then entered into an agreement to make the offer eligible for the processing of acceptances by participants at DTC through DTC's automated tender offer program.[3]

Certain of DTC's participants notified their customers (who were the beneficial owners of the shares) of IG Holdings' mini-tender offers after they received the announcement from DTC. While their practices varied, the participants usually mailed their customers a letter telling them that a tender offer had been made, the name of the offeror, the size of the offer, the offering price, the date on which the offer ended, and instructions on how to tender their shares. However, the participants did not always inform shareholders that they could not withdraw their tenders, nor were shareholders told that IG Holdings could revoke its offer at any time before

completion of the offering.

IG Holdings did not adequately attempt to determine what information was sent to shareholders by the participants or whether the information that was sent by the participants was complete and accurate. In fact, in certain instances, shareholders did not receive material information from participants about IG Holdings' mini-tender offers, including the calculation of the final price to be paid by IG Holdings and the warning (contained in certain IG Holdings material) that the offering price might not reflect the market price.[4]

IV.

OPINION

IG Holdings violated Section 14(e) of the Exchange Act because the means used to disseminate its below market mini-tender offers resulted in some shareholders not receiving material information about the offers, including the calculation of the final price to be paid by IG Holdings and the warning (contained in certain IG Holdings material) that the offering price might not reflect the market price. That information was material because a reasonable investor would consider it to be important in determining whether to tender.

V.

FINDINGS

Based on the above, the Commission finds that IG Holdings violated Section 14(e) of the Exchange Act.

VI.

ORDER

Accordingly, IT IS HEREBY ORDERED that IG Holdings, pursuant to Section 21C of the Exchange Act, cease and desist from committing or causing any violation and any future violation of Section 14(e) of the Exchange Act.

By the Commission.

Jonathan G. Katz

Secretary

---

**FOOTNOTES**

[1] Most of the mini-tender offers made by IG Holdings were for 2% of a particular issuer's outstanding stock.

[2] DTC is a national clearinghouse for the settlement of trades in corporate and municipal securities and performs securities custody services for its participating

banks and broker-dealers.

3 DTC did not charge IG Holdings any fee for its tender offer services until February 11, 1999, when it began charging a fee of $2,700 per tender offer.

4 IG Holdings' offering prices usually were reduced by any dividends or other payments made to the shareholders by the target companies. While IG Holdings' offering materials stated that the offering price would be reduced by such payments, IG Holdings never disclosed to shareholders the calculation of the revised final offering price.

*http://www.sec.gov/litigation/admin/34-41759.htm*

Home | Previous Page                                          Modified:08/20/1999

EXHIBIT

3

U.S. Securities and Exchange Commission

# UNITED STATES OF AMERICA
## before the
## SECURITIES AND EXCHANGE COMMISSION

Securities Exchange Act of 1934
Release No. 41760 / August 19, 1999

Administrative Proceeding
File No. 3-9981

| In the Matter of | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |
|---|---|
| PEACHTREE PARTNERS, Respondent. | |

I.

The Commission deems it appropriate that proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Peachtree Partners.

II.

In anticipation of the institution of these administrative proceedings, Peachtree Partners has submitted an Offer of Settle-ment that the Commission has determined to accept. Solely for the purposes of these proceedings and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, and prior to a hearing and without admitting or denying the findings set forth herein, Peachtree Partners consents to the entry of this Order Instituting Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"). The Commission has determined that it is appropriate to accept the Offer of Settlement from Peachtree Partners, and accordingly is issuing this Order.

III.

FACTS

Based on the foregoing, the Commission finds that:

A. Respondent

Peachtree Partners is a general partnership, with its principal offices located in Phoenix, Arizona. At all relevant times, Peachtree Partners has been engaged in the business of investing in securities, including equities, bonds

and limited partnership interests, primarily by making tender offers for such securities.

B. Peachtree Partners' Violation

This proceeding involves a so-called mini-tender offer made by Peachtree Partners. Mini-tender offers are tender offers for less than 5% of a class of securities. These offers are not subject to the filing, disclosure and procedural requirements of Section 14(d) of the Exchange Act and Regulation 14D. However, all tender offers, including mini-tender offers, are subject to the antifraud provisions of the federal securities laws, including Section 14(e) of the Exchange Act and Regulation 14E.

On July 5, 1998, Peachtree Partners made a tender offer to purchase 4.9% of the outstanding limited partnership interests of Shearson Murray Realty Fund 7. At the time of the offer, Peachtree Partners owned approximately 1% of these securities.[1] Because Peachtree Partners would have owned more than 5% of the securities after consummation of the tender offer, it was required to comply with the filing, disclosure and procedural requirements of Section 14(d) of the Exchange Act and Regulation 14D. It did not do so.

IV.

OPINION

Section 14(d) of the Exchange Act and Regulation 14D make it unlawful for a bidder to make a tender offer if, after consummation thereof, the bidder would be the beneficial owner of more than 5% of the class of securities for which the tender offer is made, unless the bidder complies with the filing, disclosure and procedural requirements of Section 14(d) and Regulation 14D. Peachtree Partners violated these provisions with respect to its July 5, 1998 tender offer for Shearson Murray Realty Fund 7 limited partnership interests because it did not comply with these requirements.

V.

FINDINGS

Based on the above, the Commission finds that Peachtree Partners violated Section 14(d) of the Exchange Act and Regulation 14D.

VI.

ORDER

Accordingly, IT IS HEREBY ORDERED that Peachtree Partners, pursuant to Section 21C of the Exchange Act, cease and desist from committing or causing any violation and any future violation of Section 14(d) of the Exchange Act and Regulation 14D.

By the Commission.

Jonathan G. Katz

Secretary

**FOOTNOTES**

1 These securities were acquired by Peachtree Partners in February 1998 as a result of a prior mini-tender offer.

*http://www.sec.gov/litigation/admin/34-41760.htm*

Home | Previous Page                                    Modified:08/20/1999

EXHIBIT

4

TERMED

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:02-cv-01685-PGR

SEC v. Gaines, et al
Assigned to: Judge Paul G Rosenblatt
Demand: $0
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 08/29/2002
Date Terminated: 01/06/2004
Jury Demand: None
Nature of Suit: 850
Securities/Commodities
Jurisdiction: U.S. Government Plaintiff

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2004 | 21 | AGREED FINAL JUDGMENT AS TO DEFENDANT IRA J. GAINES by Judge Paul G. Rosenblatt : granting Stipulation and Consent of Defendant Ira J Gaines to Agreed Final Judgment as to Defendant Ira J Gaines by pla SEC, dft Ira J Gaines [20-1]; IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of this Agreed Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[15 USC 78j(b)] and Rule 10b-5 promulgated thereunder [17 CFR 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; FURTHER ORDERED that Defendant and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of this Agreed Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 14(e) of the Exchange Act [15 USC 78n(e)] and Rule 14e-1 [17 CFR 240.14e-1] promulgated thereunder, in connection with any tender offer or request or invitaion for tenders, from (a) making untrue statements of material fact, or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or (b) engaging in fraudulent, deceptive or manipulative acts or practices; FURTHER ORDERED that Defendant and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of this Agreed Final Judgment by personal service or otherwise are permanently restrained and enjoined from directly or indirectly, |

offering, making or engaging in a mini-tender offer, which is defined as an offer for less than five percent of a public company's equity securities that are not subject to the disclosure and procedural rules that apply to other types of tender offers. The above language does not pertain to offers to purchase bonds or limited partnerships; FURTHER ORDERED that Defendant is liable for disgorgement of $63,810, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $8,603, for a total of $72,413. Defendant shall satisfy this obligation by paying $72,413, within ten (10) business days after entry of this Agreed Final Judgment by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, Operations Center, 6432 General Green Way, Mail Stop 0-3, Alexandria, Virginia 22312, and shall be accompanied by a letter identifying Ira J. Gaines as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made pursuant to this Agreed Final Judgment; FURTHER ORDERED that Defendant shall pay a civil penalty in the amount of $50,000 pursuant to Section 21(d) of the Exchange Act [15 USC 78u(d)]. Defendant shall make this payment within ten (10) business days after entry of this Agreed Final Judgment by certified check, bank cashier's check, or United States postal money order payable to teh Securities and Exchange Commission. The payment shall be delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Mail Stop 0-3, Alexandria, Virginia 22312, and shall be accompanied by a letter identifying Ira J. Gaines as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made pursuant to this Agreed Final Judgment; FURTHER ORDERED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein; FURTHER ORDERED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Agreed Final Judgment; There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Agreed Final Judgment forthwith and without further notice; case terminated , (cc: all counsel) (SAT) Modified on 01/06/2004 (Entered: 01/06/2004)

EXHIBIT

5



U.S. Securities and Exchange Commission

## U.S. SECURITIES AND EXCHANGE COMMISSION

**Litigaton Release No. 18535 / January 9, 2004**

***Securities and Exchange Commission v. Ira J. Gaines, et al.* Civil Action No. 02-CV-1685 PHX (PGR), United States District Court for the District of Arizona.**

On January 6, 2004, the Honorable Paul G. Rosenblatt, U.S. District Judge, District of Arizona, entered an Agreed Final Judgment against Ira J. Gaines, which permanently enjoins Gaines from violating Sections 10(b) and 14(e) of the Securities Exchange Act of 1934, and Rules 10b-5 and 14e-thereunder. Further, under the terms of the order to which Gaines consented, he is prohibited from directly or indirectly, offering, making or engaging in mini-tender offers in the future. In addition, Gaines must also pay $72,413 in disgorgement, including prejudgment interest, and a $50,000 civil penalty.

The Commission's Complaint charged that Gaines, individually and d/b/a Wrigley Drive Partners and Morten Avenue Partners, from September 1999 through March 2001, made fraudulent "mini-tender offers" to shareholders to purchase up to 1% of the outstanding stock of 287 public companies. "Mini-tender offer" is a securities industry term for a tender offer resulting in ownership by the offeror of not more than 5% of a public company's securities. Gaines deceived the shareholders by failing to disclose in his offers the following material facts: (1) Gaines' offer price was below the prevailing market price; (2) Gaines reserved sole discretion to modify his offers, including such terms as the offer price and the offer period; and (3) Gaines reserved the right to terminate his offers without notice, regardless of how many shareholders had tendered shares. According to the Commission, Gaines knew, or was reckless in not knowing, that the shareholders were not receiving this material information, and supported this allegation by pointing out that in 1999, for virtually identical conduct, Gaines agreed to a Commission order against his previous company, IG Holdings. In the Matter of IG Holdings, Inc., Exchange Act Release No. 41759 (August 19, 1999).

*http://www.sec.gov/litigation/litreleases/lr18535.htm*

EXHIBIT

6

November 20, 2008

**OFFER TO PURCHASE**
**UP TO 4.9% OF THE OUTSTANDING**
**REIT SHARES**
**BY PEACHTREE PARTNERS**

# GTJ REIT

## $6.00 Cash per Share of REIT Stock

Peachtree Partners offers to purchase shares ("Shares") of "GTJ REIT" (the "Company") at a price of **$6.00** per Share, less transfer fees of $150.00 per investor, and less any distributions paid after November 20, 2008. There is no established market for the Shares and this price may not represent the fair value of your share. **This offer expires January 20, 2009.**

**Please consider the following:**

- You may obtain information on company assets, value or liquidity from the company and from the periodic financial statements issued by the company and filed with the SEC (www.sec.gov). We have not undertaken any due diligence investigation of such filings.
- The sale of your shares may be a taxable event at capital gain rates and you should consult your tax advisor.
- You will not be charged a commission on the sale of your shares except for the administrative fee.
- By selling your REIT shares, you give yourself the opportunity to place the proceeds from the sale into other more liquid investments. You may also simplify your tax returns by eliminating future K-1 reporting for this REIT.
- The company has just recently reorganized and is geared for long term investment. Besides owning bus companies as the core business, they have added an office building and plan to add strategic properties as the opportunity arises. The company has been making quarterly distributions and plans to do so for the foreseeable future. We are unaware of any plans to sell any of the assets and liquidate the company.
- You may prefer to receive cash now rather than waiting for the company to liquidate.
- The company may respond to this offer within 10 days of its becoming aware of our offer. You may wish to wait until then before tendering your shares. However, we encourage you to begin your decision making process immediately if you are interested in accepting our offer, as only a limited number of shares will be purchased.

**Important Investment Considerations:**

- Peachtree Partners is making this offer intending to make a profit in the future.
- We make offers to purchase the shares and units of numerous limited partnerships and REITs. We have sufficient funds on hand to purchase all shares that will be tendered.
- To determine the offer price of the shares we have considered among other criteria, the prospects for the company, current market conditions and the limited liquidity of the shares. There is no assurance that other purchasers would come to the same or to a similar valuation of the shares.
- You have the right to withdraw and rescind this offer for a period of 15 days from the postmark of your acceptance of this offer.
- You will be paid for your shares promptly after the company has confirmed to us that the shares have been validly transferred. In the event that there is a delay by the company in transferring your shares or in sending us confirmation of the transfer, this offer will be automatically extended until such transfer is confirmed. We are not affiliated with the REIT and we have no control over the company, or over the length of time they may take to provide such confirmation.
- This offer is being made by Peachtree Partners without any approval or endorsement from the company, either expressed or implied.
- In 2003, one of the principals entered into consent with the SEC enjoining him from offering, making or engaging in mini-tenders for a public company's equity securities. This consent specifies that it does not pertain to offers to purchase limited partnership interests or private REIT shares such as this. The full text of the consent and final judgment is available at (www.sec.gov).
- We are buying your shares for investment purposes and we will not purchase more than 4.9% of the 9,696,520 outstanding shares, including those we already own.
- We reserve the right to assign our ownership to our affiliates, but in no event will we collectively own more than 4.9%.
- Other than stated herein, we will not extend this offer. We may in the future make additional tenders for shares at higher prices.

Page 1 of 3

- This tender offer is not subject to certain rules and regulations of the SEC. Accordingly, it may not contain all of the disclosure or procedures set forth in those rules and regulations. Please see the "SEC" report "Commission Guidance on Mini-Tender Offers and Limited Partnership Tender Offers" for a full explanation of SEC rules on tenders.

**Direct questions concerning this offer to us at 1-800-832-2557
Or email us at peachtreeoffers@aol.com.**

**For quotes on other partnerships, CALL us!!**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FOLLOW THESE STEPS TO COMPLETE THE ASSIGNMENT FORM & LIMITED POWER OF ATTORNEY ENCLOSED:

1. Please clearly print **exactly** the name, social security or Tax ID number as it appears on the records of the partnership.

2. Please clearly print your current address, and telephone number.

3. Indicate the number of shares you own.

4. Sign your name, (if held jointly, both parties must sign)

5. If the owner or a co-owner is deceased, enclose a Certified Death Certificate, Affidavit of Domicile and Letters of Testamentary, Court Appointment or Will dated within 60 days.

6. **Your signature must be "Signature Guaranteed" (Medallion Stamp)** by a commercial bank or brokerage firm. This is a special stamp that your banker or broker uses.

7. **If your shares are held in a Trust, Profit Sharing or Pension Plan, attach the first page, signature pages, and the section of the Trust Agreement showing that the signer has the authority to sign the Agreement on behalf of the Trust or Plan.**

8. If your shares are held in an "IRA", indicate custodian and account # on the form.

**Peachtree Partners
1819 E. Morten Ave, Ste 180 Phoenix, AZ 85020
(602) 870-8862 (800) 832-2557
(602) 870-9122 Fax
peachtreeoffers@aol.com**

## ASSIGNMENT FORM & LIMITED POWER OF ATTORNEY

November 20, 2008

Partnership: GTJ REIT

Price per share: $6.00
One time administrative fee: $150.00

Seller
Name: _____

Number of Shares:        _____

Address: _____

Social Security/Tax ID#: _____

Telephone Number: _____

_____

**(Only if partnership is in an IRA or is held by other than individual ownership)**

**Custodian Name/Account #:**_____

The seller, as referenced above, hereby, irrevocably, appoints Ira Gaines, with full power of substitution, to be the seller's true and lawful agent and "attorney-in-fact" with full powers to execute, acknowledge, record, and receive any and all contracts, agreements, documents, instruments, and reports and to take any and all other actions on our behalf that are or may be required or appropriate in connection with the transfer of the above described investment and in the quantity indicated and to take any and all other actions on our behalf in the exercise of any of seller's rights or privileges as share holders in the above described investment. We agree that all distributions and future legal settlement payments will belong to the buyer and instruct the transfer agent to change the address for these payments as instructed by purchaser. We further irrevocably direct our custodian, trustee, or any other nominee, if applicable, to execute and deliver any documents to complete the transfer or assignment and purchase of the "Shares".

Executed this _____ day of _____, 2008 in _____, _____, _____.
                                                                          City                  State            County

_____
Seller Signature

_____
Joint Seller Signature

_____
Signature Guarantee

_____
Signature Guarantee

**Your signature(s) must be "Signature Guaranteed" (Medallion Stamp)**
**Obtain this stamp at a commercial bank or brokerage firm.**

**Peachtree Partners**
**1819 E. Morten Ave, Ste 180 Phoenix, AZ 85020**
**(602) 870-8862 (800) 832-2557**
**(602) 870-9122 Fax**
**peachtreeoffers@aol.com**

EXHIBIT

7



**RMF**

RUSKINMOSCOUFALTISCHEK P.C.

*Counselors at Law*

Writer's Direct Dial:  (516) 663-6519
Writer's Direct Fax:  (516) 663-6719
Writer's E-Mail:.     asilvers@rmfpc.com

December 3, 2008

**VIA FEDERAL EXPRESS**

Mr. Ira J. Gaines
Peachtree Partners
1819 East Morten Avenue
Suite 180
Phoenix, AZ  85020

Re:    GTJ REIT Mini-Tender Offer

Dear Mr. Gaines:

On behalf of GTJ REIT, Inc. ("GTJ" or the "Company") we are writing to you in response to Peachtree Partners' recent tender offer to purchase up to 4.9% of the outstanding shares of common stock of GTJ (the "Offer") from the stockholders of the Company. The Offer raises a number of issues and contains several inaccuracies and inconsistencies, which GTJ intends to highlight in its opposition statement to be provided to its stockholders. Among the most troubling is that the Offer letter disseminated to GTJ's stockholders states:

> "In 2003, one of the principals entered into consent with the SEC enjoining him from offering, making or engaging in mini-tenders for a public company's equity securities. This consent specifies that it does not pertain to offers to purchase limited partnership interests or private REIT shares such as this. The full text of the consent and final judgment is available at (www.sec.gov)."[1]

We assume you to be the undisclosed principal referred to and that statement is in reference to the civil case commenced against you in the Federal District Court of Arizona, *SEC v. Gaines*, et al, docket # 02-cv-01685-PGR, and final judgment entered on January 6, 2004

---

[1] We note that it is of little or no value to a stockholder to provide the web addresses of the SEC's homepage (as opposed to the specific page on the SEC's website containing information about the SEC enforcement proceedings in question) without providing the identity of the principal in question.





Mr. Ira J. Gaines
December 3, 2008
Page 2

granting stipulation and consent (the "Order"). We have reviewed the Order and draw your attention to the following excerpt:

> *"That Defendant and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of this Agreed Final Judgment by personal service or otherwise are permanently restrained and enjoined from directly or indirectly, offering, making or engaging in a mini-tender offer, which is defined as an offer for less than five percent of a public company's equity securities that are not subject to the disclosure and procedural rules that apply to other types of tender offers. The above language does not pertain to offers to purchase bonds or limited partnerships."*

We believe that the Offer is not permitted under the terms of the Order. Specifically, GTJ is a "public company" (with in excess of 300 stockholders) that is required to file periodic reports with the Securities and Exchange Commission pursuant to Section 15(d) of the Securities Exchange Act of 1934, as amended. GTJ is not a limited partnership, and we see no carve out in the Order that permits mini tender offers of REIT shares. We are contacting the Securities and Exchange Commission to confirm our interpretation of the terms and effect of the Order.

In addition, GTJ furnished a copy of its stockholder list to Paradise Wire and Cable Defined Benefit Pension Plan ("Paradise"), a stockholder of record of the Company. Our articles of incorporation require that the Company furnish stockholders with a copy of our stockholder list upon request, and that a stockholder may utilize the stockholder list in connection with matters relating to stockholders' voting rights, and the exercise of stockholder rights under federal proxy laws. The stockholder list was furnished to Paradise only after receipt from Paradise of assurances of its compliance with the foregoing. On behalf of GTJ we hereby request that you advise the undersigned how, and from whom, Peachtree obtained the stockholder list. We have to investigate the source of Peachtree Partner's information to protect our stockholders from a potential violation of our articles of incorporation since, as indicated above, the use of the stockholder list is restricted. In addition, unauthorized dissemination of our stockholder list compromises the safety of our stockholders' personal information.



Mr. Ira J. Gaines
December 3, 2008
Page 3


    We suggest that you have your counsel contact us so that we may discuss this matter further.

                                            Very truly yours,

                                            ADAM P. SILVERS
                                            For the Firm

APS:mec
438632


cc:    Jerome Cooper